UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SETTLERS HOSPITALITY GROUP, LLC, d/b/a LEDGES HOTEL; SETTLERS HOTEL; ART ON THE EDGE; AND COCOON, | CIVIL ACTION NO. 3:22-CV-00966 |
| Plaintiff, | (MEHALCHICK, J.) |
| v. | |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

**MEMORANDUM**

Plaintiff Settlers Hospitality Group ("Settlers") initiated this action for breach of contract and bad faith against Defendant Zurich American Insurance Company ("Zurich") by filing a complaint on March 10, 2022 in the Lackawanna County Court of Common Pleas. (Doc. 1-2, at 4-40). Settlers asserts claims of breach of contract and bad faith. (Doc. 1-2, at 32-40). Zurich removed the litigation to this Court on June 16, 2022, pursuant to 28 U.S.C. §1332. (Doc. 1). According to Settlers, Zurich has failed to fully reimburse it for losses incurred as a result of business closures during the Covid-19 pandemic, as required by the parties' insurance contract ("the Policy"), under the Communicable Disease Business Losses Section ("CD Coverage"). (Doc. 1-2, at 4-40). Before the Court is Zurich's motion for summary judgment (Doc. 51) and Settler's cross-motion for partial summary judgment (Doc. 52). For the following reasons, both motions will be **DENIED**. (Doc. 51; Doc. 52).

I. **BACKGROUND AND PROCEDURAL HISTORY**

Unless otherwise indicated, the following factual summary is taken from the parties' filings relevant to the instant motions for summary judgment. (Doc. 51; Doc. 52; Doc. 53;

Doc. 54; Doc. 55; Doc. 59; Doc. 62; Doc. 64; Doc. 65; Doc. 66; Doc. 70; Doc. 71). Settlers is a hospitality group that contracted with Defendant for a commercial insurance policy, Policy No. CPO 0220048-02, effective July 1, 2019 to July 1, 2020 ("the Policy"). (Doc. 55, ¶ 10; Doc. 66, ¶ 10). Under the Policy (Doc. 52-2), Zurich insures Settlers (and its five properties) for a variety of potential events, including business losses associated with closures due to "communicable diseases" ("CD Coverage"). (Doc. 52-2; Doc. 55, ¶ 15; Doc. 66, ¶ 15). The CD Coverage reads, in relevant part:

> If the BUSINESS INCOME COVERAGE FORM (EXCLUDING EXTRA EXPENSE) is included in this Commercial Property Coverage Part, the coverage provided at a "premises" or "reported unscheduled premises" will also cover the actual loss of "business income" you sustain resulting from the necessary "suspension" of your "operations" if the "suspension" is caused by an order of an authorized public health official or governmental authority that prohibits access to the "premises" or "reported unscheduled premises", or a portion of that "premises" or "reported unscheduled premises". That order must result from the discovery or suspicion of a communicable disease or threat of the spread of a communicable disease at that "premises" or "reported unscheduled premises".
>
> Coverage provided applies only to the actual loss of "business income" you sustain beginning 24 hours after you receive notice of an order by an authorized public health official or governmental authority that results in the necessary "suspension" of your "operations". The coverage provided ends when an authorized public health official or governmental authority authorizes you to resume normal "operations", or after 90 days, whichever is earlier.
>
> The most we will pay under this Additional Coverage at any one "premises" or "reported unscheduled premises" is the Limit of Insurance shown on the Declarations for Communicable Disease Suspension of Operations--Business Income.
>
> This Limit for this Additional Coverage is included in, and not in addition to, any other applicable Limits of Insurance.
>
> (Doc. 52-2, at 168) (emphasis omitted).

The Limit of Insurance shown on the Declarations for Communicable Disease Suspension of Operations--Business Income states that there is a $100,000 "per occurrence" limit of

insurance. (Doc. 52-2, at 33). On the same page, other coverage limits for "Fairs or Exhibitions" and "Decontamination Expense," "Historic Certification Expense," and Emergency Vacating Expense" are also denoted as "per occurrence." (Doc. 52-2, at 33). Meanwhile, also on the same page, "Extra Expense," "Fire Department Service Charge," and "Expediting Expense" have a monetary limit of insurance that reads "per premises." (Doc. 52-2, at 33).

On March 19, 2020, an Executive Order was issued compelling the closure of the physical operations of all non-life-sustaining businesses. (Doc. 55, ¶ 28; Doc. 65, ¶ 28). As a result, Settlers was required to limit some operations. (Doc. 55, ¶ 34; Doc. 65, ¶ 34). Settlers then made a claim for its losses to Zurich. (Doc. 55, ¶ 36; Doc. 66, ¶ 36). Lindsey Harrell ('Harrell"), insurance claims professional for Zurich, reviewed the claim. (Doc. 65, ¶ 23). Over the next several months, Settlers and Zurich disagreed about what constituted "actual losses" under the Policy, and whether Settler's received Paycheck Protection Program ("PPP") loans under the CARES Act would offset losses. (Doc. 54, ¶¶ 55-63; Doc. 65, ¶¶ 55-63). Despite the disagreements, on June 1, 2020, Zurich paid Settlers an advance payment under the Policy for $50,684.00. (Doc. 54, ¶ 52; Doc. 65, ¶ 52). According to Zurich, when accounting for PPP loans as income that offsets losses, Settlers is not owed any more payment under the Policy. (Doc. 55, ¶ 64). Settlers disputes the characterization of PPP loans as income. (Doc. 65, ¶ 64). As such, Settlers asserts that failure to pay what it is allegedly owed constitutes breach of contract and bad faith. (Doc. 1-2, at 32-40). Zurich filed the instant motion for summary judgment and accompanying exhibits on July 12, 2024 and filed its brief in support on July 15, 2024. (Doc. 51; Doc. 53). On July 12, 2024, Settlers also filed its cross-motion for partial summary judgment and field its brief in support as well as accompanying

exhibits on July 26, 2024. (Doc. 52; Doc. 59). Both parties filed their respective briefs in opposition to opposing party's motion on August 22, 2024. (Doc. 62; Doc. 64). On September 12, 2024, both parties filed their respective reply briefs. (Doc. 70; Doc. 71). Accordingly, the matter is now ripe for disposition. (Doc. 52; Doc. 59; Doc. 62; Doc. 64; Doc. 70; Doc. 71).

## II. LEGAL STANDARDS

### A. MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,*

4

477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential).

    B.    INSURANCE CONTRACT INTERPRETATION

Under Pennsylvania law, "the interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999). The Supreme Court of Pennsylvania has instructed that "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (1983) (citations omitted).

"In interpreting an insurance policy, a court must ascertain the intent of the parties as manifested by the language of the written agreement." *Stevens Painton Corp. v. First State Ins. Co.*, 746 A.2d 649, 657 (Pa. Super. Ct. 2000).

Moreover, "[c]ourts interpret coverage clauses broadly 'to afford the greatest possible protection to the insured,' and, accordingly, they interpret exceptions to an insurer's general liability narrowly against the insurer." *Verticalnet, Inc. v. U.S. Specialty Ins. Co.*, 492 F. Supp. 2d 452, 456 (E.D. Pa. 2007) (quoting *Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 498 n.7 (3d Cir. 2002)). The "insurance policy must be read as a whole and construed according to the plain meaning of its terms." *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981). Furthermore, the court must enforce the plain language of the policy if its terms are clear and unambiguous. *Standard Venetian Blind*, 469 A.2d at 566 (citation omitted).

### III. DISCUSSION

Arguing for summary judgment, Zurich avers that it did not breach its insurance contract with Settlers because the PPP loans that Settlers received were "income" which reduced its covered business losses to below what it had already received from Zurich via the advance payment. (Doc. 53, at 19-25). Zurich further posits that CD coverage is limited to $100,000 per occurrence, meaning that Settlers can only recover a maximum of $100,000 in total, rather than $100,000 for each covered premise ($500,000 in total). (Doc. 53, at 25-34). Zurich contends that it is entitled to summary judgment for Settlers's bad faith claims because there can be no bad faith where there is no breach of contract in the first place and even if there was a breach, Zurich's interpretation of the Policy was not unreasonable. (Doc. 53, at 36). Settlers opposes Zurich's motion for summary judgment on the basis that that there are material facts in dispute regarding whether PPP loans are income and therefore whether

6

Zurich breached its contract with Settlers. (Doc. 53, at 24; Doc. 64, at 9). Settlers also moves for partial summary judgment on the issue of the maximum Policy limit, asking that this Court "declare that the total business interruption coverage under the subject Policy is $100,000.00 per occurrence at each scheduled location." (Doc. 59, at 30).

    A.    DOES SETTLERS'S PPP LOAN OFFSET RECOVERY?

In making its argument that the PPP loans Settlers received are income, Zurich first notes that its Policy covers actual loss of business income that resulted from the Covid-19 governmental action which limited Settlers's business operations. (Doc. 53, at 7). According to Zurich, "[t]o calculate the 'actual loss of business income' of an insured when a business continues to partly operate (as Settlers did), one looks at the differential between 1) what Settlers's likely net income (gross income minus expenses) would have been during the relevant time period if the triggering event had not occurred and 2) the net income that was received by Settlers in connection with its continuing operations for that period." (Doc. 53, at 21). Next, Zurich states, "Settlers used $638,760 of the total [$1.2 million in PPP loans…] received to pay expenses for its covered operations during the relevant time period." (Doc. 53, at 21). Thus, Zurich submits that it correctly considered the PPP forgiven funds in offsetting Settlers's losses and as its "calculations demonstrate, Settlers has no actual loss of business income that has not been fully reimbursed already." (Doc. 53, at 25). Settlers responds that the term "actual loss" is ambiguous because it is not clear whether PPP loans are included in its calculation. (Doc. 64, at 9). As an ambiguous term that should be construed in favor of the insured, Settlers argues that PPP loans should not be considered income for the calculation of actual loss. (Doc. 64, at 9). Settlers contends that Zurich is not entitled to

7

summary judgment since there remain issues of material fact about how much Settlers is owed. (Doc. 64, at 4-9).

Whether PPP loans qualify as income for the purposes of offsetting "actual losses" is an issue of first impression in this Circuit.[1] Therefore, it is helpful to analogize to other government assistance programs in the wake of national emergencies that affected businesses' incomes, such as similar situations related to the 9/11 terrorist attacks and the Hurricane Katrina recovery efforts. *See PMA Capital Ins. Co v. US Airways, Inc.*, 626 S.E.2d 369 (Va. 2006);

---

[1] In *K.C. Hopps*, Judge Bough in the Western District of Missouri, Western Division, denied an insurer's motion for summary judgment, holding that "[b]ecause the purpose of the PPP loans was not to compensate [p]laintiff for a loss covered by the [p]olicy, [p]laintiff has properly demonstrated a genuine dispute regarding its loss of business income." *K.C. Hopps*, 561 F. Supp. 3d at 842. The *K.C. Hopps* court relied on the parties' arguments analogizing the PPP loans to programs that assisted businesses after 9/11 and Hurricane Katrina. *See PMA*, 626 S.E.2d 369; *Northrop*, 2013 WL 3946103. This Court asked Defendant about this case at oral argument, and Defendant answered that the case was inapposite because the Eighth Circuit reversed on appeal. However, this Court was unable to verify that contention. It appears that a jury found in favor of the defendant once the case went to trial because the policy at issue in *K.C. Hopps* protected against only physical loss or physical damage, which the jury determined did not include pandemics. *K.C. Hopps, Ltd. v. Cincinnati Ins. Co., Inc.,* 78 F.4th 1002, 1004 (8th Cir. 2023). The plaintiff requested a new trial, which the district court denied. *K.C. Hopps,* 78 F.4th at 1004. The Eighth Circuit affirmed the district court's denial of a new trial. *K.C. Hopps,* 78 F.4th at 1005. The Eighth Circuit never discussed, let alone overturned, Judge Bough's reasoning regarding PPP loans and their relevance for calculating actual losses. *K.C. Hopps*, 561 F. Supp. 3d at 842. Regardless, while the policy at issue in *K.C. Hopps* did not deal with CD Coverage, Judge Bough's reasoning in denying summary judgment does not implicate the type of loss but relies only on Congress's intent about whether to define PPP loans as income or not. Accordingly, it remains relevant here. The Court will not rely on *K.C. Hopps* as a non-binding case but will conduct its own analysis of *Northrop* and *PMA* as on-point cases dealing with analogous federal assistance programs to determine the purpose of the PPP loans.

Additionally, in a more recent case out of the District of Oregon, the court declined to consider PPP loans as "income" for tax purposes because the loans were "extraordinary" and "available only in the unique circumstances of the COVID-19 pandemic and restricted by Congress to certain permissible uses." *Fields v. Emergency Servs. Consulting Int'l, Inc.*, No. 3:23-CV-00912-IM, 2024 WL 5202122, at *6 (D. Or. Dec. 23, 2024)

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. CV 05-08444 DDP, 2013 WL 3946103 (C.D. Cal. July 31, 2013).

In *PMA Capital Ins. Co v. US Airways, Inc.*, the court held that the funds that U.S. Airways received from the Air Transportation Safety and System Stabilization Act (the "Stabilization Act") reduced its losses relevant for insurance compensation. *See PMA*, 626 S.E.2d at 371. The *PMA* court reasoned that the Stabilization Act's plain language indicated that Congress designed it to "'compensate air carriers' like US Airways for both 'direct losses' as a result of 'any Federal ground stop order' and 'incremental losses' as a 'direct result of' the September 11, 2001, terrorist attacks." *PMA*, 626 S.E.2d at 359, 369 (citations omitted). Therefore, it was proper for the insurance company to reduce its insured's claimed actual losses by the amount it received in government assistance, as both the insurance policy and the Stabilization Act funds were intended to compensate for direct losses. *PMA*, 626 S.E.2d at 369.

In *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, a defense contractor's ships were damaged by Hurricane Katrina. *Northrop*, 2013 WL 3946103, at *2. Northrop received payment from the Navy as well as a tax credit of about $9.4 million pursuant to the Katrina Emergency Tax Relief Act of 2005 and the Gulf Opportunity Zone Act of 2005. *Northrop*, 2013 WL 3946103, at *2. The *Northrop* court reasoned that the tax credit could not offset the insured's recovery because "the Tax Credit was conceived as an incentive to retain employees rather than compensation for a loss[.]" *Northrop*, 2013 WL 3946103, at *6.[2]

---

[2] The *Northrop* court also found reimbursement and forgiveness relevant in its analysis. *Northrop*, 2013 WL 3946103, at *5. The *Northrop* court distinguished the tax credit issue different from cases concerning FEMA assistance in similar fact patterns because "[i]n the FEMA statute, Congress explicitly required FEMA funds to be reimbursed if recipients of those funds were 'available to the person for the same purpose from another source.'"

9

Here, like the Katrina tax credit, Congress intended the PPP loans to keep "workers paid and employed." *Business Loan Program Temporary Changes; Paycheck Protection Program – Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act*, 86 Fed. Reg. 8283-02, 8285, 2021 WL 394729 (Feb. 5, 2021). There is nothing this Court can find in the Paycheck Protection Program's review or procedures that would indicate that Congress intended the loans to compensate for lost income rather than to incentivize employee retention. It is clear from the language of the Economic Aid Act that PPP loans were intended to keep employees paid, not to assist with recuperating "actual losses." *See Business Loan Program Temporary Changes; Paycheck Protection Program – Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act*, 86 Fed. Reg. 8283-02, 8285, 2021 WL 394729 (Feb. 5, 2021). Further, Settlers would have received the PPP loan regardless of whether the business had to close. In other words, the PPP loan and the CD Coverage are not so clearly co-extensive that summary judgment is appropriate. That Congress has required PPP loans to be repaid if they were not used solely for worker retention bolsters this conclusion. *See Business Loan Program Temporary Changes; Paycheck Protection Program – Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act*, 86 Fed. Reg. 8283-02, 8285, 2021 WL 394729 (Feb. 5, 2021).

---

*Northrop*, 2013 WL 3946103, at *5 (citing 42 U.S.C. § 5155 and *Hawaii v. FEMA*, 294 F.3d 1152, 1158 (9th Cir.2002). After Katrina, however, "although Congress was doubtless aware that at least some employers would have business interruption insurance, Congress did not require reimbursement of the Tax Credit in the statute." *Northrop*, 2013 WL 3946103, at *5. Again, this is relevant in the present analysis. Congress likely knew that some businesses would have insurance policies that would compensate for losses related to Covid-19. However, Congress did not condition repayment on the ability of a business to recover from private insurance policies. *Business Loan Program Temporary Changes; Paycheck Protection Program – Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act*, 86 Fed. Reg. 8283-02, 8285, 2021 WL 394729 (Feb. 5, 2021).

Importantly, however, it is not this Court's role to weigh evidence at the summary judgment stage. *Anderson*, 477 U.S. at 248. Instead, this Court must consider only whether a reasonable fact-finder would be able to conclude that Settlers's PPP loans were intended to incentivize employee retention, rather than compensate for lost income. *See Anderson*, 477 U.S. at 248. This Court finds that a reasonable juror may conclude as much. *See First United Pentecostal Church v. Church Mut. Ins. Co.*, No. 23-30779, 2024 WL 4511240, at *7 (5th Cir. Oct. 17, 2024) (affirming a district court's denial of an insurance company's motion for judgment as a matter of law "'when there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss,'" and the insurance company allegedly did not pay the insured on time) (quoting *Louisiana Bag Co. v. Audubon Indem. Co.*, 999 So. 2d 1104, 1114 (La. 2008)).

The fact that Settlers identified its PPP loan as income on its tax return is probative but still does not render Zurich entitled to summary judgment. Settlers averred at oral argument that the definition of income for tax returns purposes differs from how it is used in a contract. In personal injury cases, courts have held that tax credits that impact income on tax returns do not alter calculations of income for damages or recovery purposes. *See Danzig*, 161 Cal. App. 3d at 1139 ("tax consequences are irrelevant to the recovery of damages"). Therefore, there are questions of material fact best left to a fact-finder regarding whether Settlers's PPP loans should count as income and offset its availability recovery under the Policy. Zurich's motion for summary judgment on the issue of whether Settlers is owed any additional coverage is **DENIED**. (Doc. 51).

    B.    <u>Does the $100,000 "Per Occurrence" Policy Limit Apply "Per Premises"?</u>

The parties cross-move for summary judgment on the issue of the limit for recovery under the Policy. (Doc. 53, at 25-34; Doc. 59, at 17-30). According to Zurich, it is entitled to summary judgment on the issue that Settlers cannot recover more than $100,000 total under the CD Coverage because the Policy that limits recovery to $100,000 "per occurrence" plainly refers to the communicable disease, in this case Covid-19, as a single occurrence; "per occurrence" cannot possibly mean "per premises"; "per occurrence" was not a mistake; and the CD Coverage is not ambiguous. (Doc. 53, at 25-34). Settlers argues that the CD Coverage limit of $100,000 applies "per premise"; alternatively, the policy is ambiguous and should be interpreted in Settlers's favor; and that Settlers had a reasonable expectation of the limit applying "per premise." (Doc. 59, at 17-30). Settlers cites several witnesses who all argue that they interpret the contract to mean "per location." (Doc. 59, at 24). Zurich responds that the Court is charged with contract interpretation, not witnesses. (Doc. 62, at 11-12).

In arguing for summary judgment, Zurich points to another district court case in this Circuit that considered an identical insurance policy for plaintiff Count Basie. (Doc. 53, at 28, 30; Doc. 62, at 14). In *Count Basie Theatre Inc. v. Zurich Am. Ins. Co.*, Judge Semper in the District of New Jersey concluded that the $100,000 CD Coverage limit does not apply per premise. *See* No. CV 21-00615 (JKS)(LDW), 2024 WL 2763762, at *10-11 (D.N.J. May 29, 2024). The *Count Basie* court concluded that "per occurrence" plainly refers to the pandemic as the occurrence, not a plaintiff's insured premise. *Count Basie*, 2024 WL 2763762, at *10-11. Count Basie, just like Settlers, argued that the CD Coverage line that reads, "[t]he most we will pay under this Additional Coverage at any one 'premises' or 'reported unscheduled premises' is the Limit of Insurance shown on the Declarations for Communicable Disease Suspension of Operations – Business Income" means that each insured premise is entitled to

its own $100,000 in coverage. *Count Basie*, 2024 WL 2763762, at *10-11. The *Count Basie* court, as well as Zurich in this matter, reasoned that this language clearly refers to the $100,000 limit in the Declaration "per occurrence."[3] (Doc. 52-2, at 33). The *Count Basie* court also found that the contract as a whole necessitated the outcome that the limit did not apply "per premises" because "[t]here are other forms of coverage that maintain a Limit of Insurance 'per premise.' For example, the Expediting Expense Coverage lists the Limit of Insurance as '$25,000 PER PREMISES' and the Lock and Key Replacement Coverage lists the Limit of Insurance as '$25,000 PER PREMISES.'" *Count Basie*, 2024 WL 2763762, at *11. The Third Circuit has held that "the use of different language to address the same or similar issue ... strongly implies that a different meaning was intended.... The same language was not used, however; and we must assume that the choice of different words was deliberate." *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 246 (3d Cir. 2008). Summary judgment in favor of the insurer was proper because "[a]s the [p]olicy utilizes 'per premises' for other Limits of Insurance, the Court finds the Policy intended for the CD Limit to apply 'per occurrence.'" *Count Basie*, 2024 WL 2763762, at *11.

Here, the insurance contract is identical to that in *Count Basie*. (Doc. 52-2). The Policy likewise uses "per premises" for other limits of insurance. (Doc. 52-2). For example, on the same page that the limit for CD Coverage uses the language "*per occurrence*," the Extra Expense limit is denoted as $25,000 "*per premises*." (Doc. 52-2, at 33). Accordingly, because

---

[3] Zurich further argues, "The fact that the phrase 'at any one premises' appears in the body of the CD Coverage provision does not change this result. For example, an insurance policy can have a limit of $1 million per person and an aggregate $1 million limit per accident. The CD Coverage works similarly. The Policy pays no more than $100,000 at any one premises while limiting the overall payment to $100,000 per occurrence regardless of how many premises are insured under the Policy." (Doc. 53, at 31 n.14).

13

the Policy as a whole refers to "per premises" limits for other types of insurance, the CD limit was not intended to apply per premises, but per occurrence, as the Policy states. *Count Basie,* 2024 WL 2763762, at *11. The Court does not find any evidence in the record to support Settlers's assertion that this is a mistake or ambiguous. (Doc. 59, at 17-30). As such, Zurich's motion for summary judgment on this issue will be **GRANTED**. (Doc. 51). Settlers's cross-motion for partial summary judgment will be **DENIED**. (Doc. 52).

    C.    IS ZURICH ENTITLED TO SUMMARY JUDGMENT ON SETTLERS'S BAD FAITH CLAIM?

Zurich that because it owes Settlers no money based upon its argument for summary judgment on the PPP loans issue, there can be no bad faith. (Doc. 53, at 34-37). However, because the Court will not grant summary judgment to Zurich on the issue of whether PPP loans offset recovery, it turns to whether the bad faith claim can still survive substantively. Zurich contends that "even if Zurich is wrong on its interpretation of the Policy, Settlers has not produced, and cannot produce, evidence that Zurich acted with ill will in withholding additional funds. At most, there is simply a dispute over how to interpret the Policy." (Doc. 53, at 36). Settlers responds that Zurich's claim handler misrepresented the Policy about applicable coverage; that its representation to Settlers that "CD Coverage was only $100,000.00 regardless of the number of impacted premises" despite the "clear language of the Policy"; and that errors in Zurich's forensic accountant's report constitute bad faith. (Doc. 64, at 9-16).

Pennsylvania's bad faith statute provides a private cause of action against insurance companies for bad faith denials of insurance coverage. 42 Pa. C.S.A. § 8371. A successful § 8371 bad faith claim permits an award of interest on the amount of the insurance claim, punitive damages, and costs and attorneys' fees. "[A]ny frivolous or unfounded refusal to pay

14

proceeds of a policy" constitutes bad faith. *Wolfe v. Allstate Property & Cas. Ins. Co.*, 790 F.3d 487, 498 (3d Cir. 2015) (citing *Terletsky v. Prudential Property and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citation omitted)). To establish a bad faith claim, the insured must show by clear and convincing evidence that: (1) the insurer did not have a reasonable basis for denying benefits under the policy, and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the insured's claim. *Wolfe*, 790 F.3d at 498 (citing *Terletsky*, 649 A.2d at 688). Evidence of an insurer's self-interest and ill-will is probative of the second *Terletsky* prong, but not required. *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377-78, 2017 WL 4296351, at *11 (Pa. 2017). District courts have required more than "conclusory" or "bare-bones" allegations that an insurance company acted in bad faith by listing a number of generalized accusations without sufficient factual support. *See e.g., McKean v. Nationwide Ins. Co.*, No. 3:12-CV-1206, 2012 WL 12869567, at *3 (M.D. Pa. Dec. 3, 2012), *report and recommendation adopted sub nom. Stephen v. Nationwide Ins. Co.*, No. 3:12-CV-1206, 2012 WL 12871762 (M.D. Pa. Dec. 21, 2012); *Liberty Ins. Corp. v. PGT Trucking, Inc.*, Civ. A. No. 11-151, 2011 WL 2552531, at *4 (W.D. Pa. Jun. 27, 2011); *Pfister v. State Farm Fire & Cas. Co.*, Civ. A. No. 11-799, 2011 WL 3651349 (W.D. Pa. Aug. 18, 2011).

  Settlers submits that there is a genuine dispute about Zurich's motives for not including Schedule 6 or Schedule 6A in its forensic report it provided to Settlers. (Doc. 64, at 13-16). Schedule 6 and 6A contained information about how the PPP loans offset lost income and were allegedly used by Zurich in preparing its report about Settlers's actual losses. (Doc. 64, at 14). While Settlers does not explain exactly how not including Schedule 6 shows that Zurich knew or recklessly disregarded its lack of reasonable basis in denying the insured's claim, it does contend that the report was made "deceptively" and that "[d]espite knowing

15

that the report had numerous errors which made it completely unreliable," Zurich did not require a new report or find a new accountant to redo the analysis. (Doc. 64, at 15-16); *see Wolfe*, 790 F.3d at 498. Zurich contends that it did hire a new accountant to determine actual losses, an argument that is supported by evidence in the record. (Doc. 51-3, at 633-643; Doc. 70, at 19). This conflicting evidence, construed in Settlers's favor as the non-movant, is enough to survive the summary judgment stage, as there are genuine questions about Zurich's motives in how it handled creating the first forensic accounting report and how it investigated Settlers's claim, namely, whether it acted reasonably. *See Wolfe*, 790 F.3d at 498. Accordingly, Zurich's motion for summary judgment on Settlers's bad faith claim is **DENIED**. (Doc. 51).

## IV. CONCLUSION

For the foregoing reasons, Zurich's motion for summary judgment will be **DENIED** as to the issue of whether PPP loans offset Settlers's potential recovery and Settler's bad faith claim, and **GRANTED** as to the policy limit applying per occurrence rather than per premise. (Doc. 51). Settlers's motion for partial summary judgment will be **DENIED**. (Doc. 52).

An appropriate Order follows.

BY THE COURT:

Dated: February 24, 2025

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**